# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

SCOTT C. TRUMAN,

Plaintiff,

v.        3:14-CV-1195
(ATB)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

PETER A. GORTON, ESQ., for Plaintiff
JOSHUA L. KERSHNER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

In accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and N.D.N.Y. Local Rule 73.1, this matter was referred to me, with the consent of the parties, for all proceedings and entry of a final judgment, by the Honorable Glenn T. Suddaby, United States District Judge, by Order dated July 24, 2015 (Docket No. 18).

## I. PROCEDURAL HISTORY

On, February 7, 2011, plaintiff protectively[1] filed applications for both Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging

---

[1] The term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. If a statement meeting the requirements of the regulations is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date. In this case the protective filing date of February 7, 2011 is listed on the first page of each of the Disability Determination and Transmittals, dated April 15, 2011. (T. 60, 67).

disability beginning on November 4, 2010. (Administrative Transcript ("T") at 152-66).

The applications were denied initially on April 19, 2011. (T. 60-73). Plaintiff requested

a hearing before an Administrative Law Judge ("ALJ") which was conducted by ALJ

John P. Ramos on December 6, 2012 by video. (T. 34-59). ALJ Ramos issued an

unfavorable decision on March 4, 2013. (T. 13-24). ALJ Ramos's decision became the

Commissioner's final decision when the Appeals Council denied plaintiff's request for

review on September 10, 2014. (T. 1-5).

## II.     GENERALLY APPLICABLE LAW

### A.     Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or

Supplemental Security Income ("SSI") disability benefits must establish that he or she

is "unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than

twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin,*

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

4

## III. **FACTS**

Plaintiff's counsel has included a statement of facts in his brief. (Pl.'s Br. at 2-11) (Dkt. No. 12). Defense counsel has incorporated plaintiff's statement of facts as well as the findings of the ALJ at pages 16-23 of the transcript. (Def.'s Br. at 3) (Dkt. No. 19). The court will adopt the facts stated in plaintiff's brief, together with the facts as stated by the ALJ, with any exceptions as noted in the discussion below. Rather than further detailing the evidence at the outset, relevant details regarding the medical and other evidence, including the medical opinion evidence, are discussed below as necessary to address the issues raised by plaintiff.

## IV. **ALJ'S DECISION**

After finding that plaintiff met his insured status until December 31, 2014, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date of November 4, 2010. (T. 16). At step two of the sequential analysis, the ALJ found that plaintiff's lumbar degenerative disc disease, morbid obesity, uncontrolled hypertension, and depressive disorder qualified as "severe impairments." (*Id.*) The ALJ found that plaintiff had been "medically managed" for diabetes, sleep apnea, right knee pain, flank pain, renal stones, pedal edema, dyslipidemia, cannabis use, tobacco use, and gastroesophageal reflux disease ("GERD"), but that none of these conditions rose to the level of a severe impairment. (T. 17).

At step three of the analysis, the ALJ found that plaintiff's impairments did not

meet or medically equal the severity of listed impairments. (*Id.*) The ALJ compared plaintiff's impairments to Listings 1.04 (Disorders of the Spine); 12.04 (Affective Disorders); and 12.06 (Anxiety-Related Disorders). 20 C.F.R. Pt. 404. Subpt. P, App. 1, §§ 1.04, 12.04, 12.06. The ALJ stated that, although there is no specific listing regarding obesity, he evaluated the impairment pursuant to the extensive guidelines set forth in Social Security Ruling ("SSR") 02-1p, including the references in sections 1.00Q, 3.00I, and 4.00F of the Listings.[2]

In making his determination that the severity of plaintiff's mental impairment did not rise to the level of a Listing, the ALJ carefully analyzed the "paragraph B" criteria of the Listings, including determining the degree of restriction that plaintiff's mental condition had on the four relevant functional areas – activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. (T. 18-19). Plaintiff had only mild restrictions in activities of daily living and in concentration, persistence, and pace. (*Id.*) He had moderate difficulties in social functioning, but had no episodes of decompensation. (T. 18-19).

At step four of the analysis, the ALJ found that plaintiff had the residual functional capacity ("RFC") to perform sedentary work because he is able to lift and/or carry ten pounds occasionally and less than ten pounds frequently; stand and/or walk

---

[2] These explanatory sections of the Listing of Impairments discuss the effects of obesity on the Musculoskeletal (§ 1.00Q), Respiratory (§ 3.00I), and Cardiovascular Systems (§ 4.00F).

for two hours in an eight-hour day; and sit for six hours in an eight-hour day. (T. 19). The ALJ concluded that plaintiff should avoid climbing ropes, ladders, and scaffolds in addition to avoiding workplace hazards, such as unprotected heights and moving mechanical parts. (T. 19). Plaintiff was found capable of occasionally climbing stairs and ramps, balancing, stooping, kneeling, crouching , and crawling.

Mentally, the ALJ determined that plaintiff retained the ability to understand and follow simple and complex instructions and directions; perform simple and more complex tasks with intermittent supervision, and independently; maintain attention and concentration for simple and more complex tasks. (T. 19-20). Plaintiff was deemed able to regularly attend to a routine and maintain a schedule. The ALJ found that plaintiff can complete simple and more complex tasks without the need for frequent supervision and can interact with supervisors on an intermittent basis throughout the day, but should have no contact with the public. He could also handle reasonable levels of work-related stress in that he can make decisions directly related to the completion of his tasks in a stable, unchanging work environment. (T. 19-20).

In making the above mental RFC determination, the ALJ relied on the consultative opinion of Dr. Sara Long, Ph. D., who examined plaintiff on March 21, 2011. (T. 300-303). With respect to plaintiff's physical capabilities, the ALJ relied in part, on the January 3, 2013, post-hearing consultative report by Dr. Justine Magurno, M.D. (T. 20-21). The ALJ gave very little weight to a New York State Department of

Social Services ("DSS") evaluation completed by Nathan Hare, Ph. D.; a questionnaire completed by Mahfuzar Rahman, M.D.;[3] medical source statements signed by Nurse Practitioner, Dorene Aleccia; and a report completed by Lawrence Wiesner, D.O.[4] (T. 22-23).

Based on the above RFC, the ALJ found that plaintiff could perform his previous work as an electronics assembler, even though the Dictionary of Occupational Titles ("DOT") classified the job as "light" work." (T. 23-24). The ALJ found that the information in the DOT, together with plaintiff's testimony supported a finding that plaintiff's former work as an electronics assembler was performed at a sedentary level, that he did not have to interact with other employees or the public, and that he only had intermittent contact with his supervisors. (T. 23). Because the ALJ found that plaintiff could perform his prior work, the ALJ stopped at step four of the analysis and found that plaintiff was not disabled. (T. 24).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.   The ALJ did not properly consider the non-exertional limitations to the sedentary job base caused by the plaintiff's conditions. (Pl.'s Br.

---

[3] Dr. Rahman is a treating psychiatrist who submitted a mental "Questionnaire" at plaintiff's request. (T. 463-66).

[4] Dr. Weisner examined plaintiff once on June 29, 2012, and submitted a narrative report, titled "Orthopedic Independent Medical Examination," together with a form-document titled, "Work Capacities," which requires the medical source to check boxes and circle numbers, representing the amount of time that an individual can sit, stand, and walk. (T. 327-29, 330-32).

at 11-17).

2.     The ALJ erred in finding that plaintiff could perform his past relevant work, and the Appeals Council erred in failing to properly consider the vocational testimony and additional evidence submitted by plaintiff in his appeal. (Pl.'s Br. at 17-19).

3.     The ALJ improperly assessed the medical opinions. (Pl.'s Br. at 19-24).

Defendant argues that the Commissioner's determination is supported by substantial evidence and should be affirmed. For the following reasons, this court agrees with the defendant and will order dismissal of the complaint.

## VI.   Severe Impairment[5]

### A.     Legal Standards

The claimant bears the burden of presenting evidence establishing severity at Step Two of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Rep.-Rec.), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011). A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities).

---

[5] Although plaintiff's first issue alleges that the ALJ failed to properly consider plaintiff's non-exertional limitations on his ability to perform his prior work, the plaintiff divides his argument into a discussion of the ALJ's alleged error at the step two, "severity" analysis as well as a general discussion of the ALJ's failure to properly consider the non-exertional impairments that he did deem severe in the determination of plaintiff's RFC. The court will analyze each argument separately.

The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404. 1521(b). "Severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis. The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, No. 12-CV-6291, 2013 WL 5474210, at *10 (W.D.N.Y. Sept. 30, 2013) (quoting *McConnell v. Astrue*, No. 6:03-CV-521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (1985)). Although an impairment may not be severe by itself, the ALJ must also consider "the possibility of several such impairments combining to produce a severe impairment . . . ." SSR 85-28, 1985 WL 56856, at *3. However, a combination of "slight abnormalities," having no more a minimal effect on plaintiff's ability to work will not be considered severe. *Id.* The ALJ must assess the impact of the combination of impairments, rather than assessing the contribution of

each impairment to the restriction of activity separately, as if each impairment existed alone. *Id.*

The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the claim at Step Three through Step Five. *Id.* at 1030.

Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

## B. Application

Plaintiff first argues that the ALJ erred in determining that plaintiff's diabetes and sleep apnea were not severe.[6] (Pl.'s Br. at 12-14). Plaintiff argues that Dr.

---

[6] As stated above, the ALJ also found that plaintiff's right knee pain, flank pain, renal stones, pedal edema, dyslipidemia, cannabis use, tobacco use, and GERD were not severe impairments. Plaintiff does not challenge these findings, and the court concludes that the ALJ's decision regarding these additional impairments is supported by substantial evidence.

Mamadou Diallo, M.D.[7] noted that plaintiff's diabetes makes him lethargic all the time, and that although there were periods of time when the diabetes was managed with diet and oral medication, in November of 2012, Dr. Michele Boyle's report noted that plaintiff's diabetes was "uncontrolled." (T. 448).

First, even though the ALJ found that some of plaintiff's impairments were not severe, he specifically stated that the "limiting effects of all the claimant's impairments, even those that are not severe, were considered in determining the claimant's residual functional capacity assessed below." (T. 17). Thus, the ALJ did not deny plaintiff's application based solely on the lack of a severe impairment, and even if his analysis was erroneous, the error would have been harmless. The ALJ discussed the subsequent steps of the sequential evaluation,[8] stating that he considered the limiting effects of the non-severe impairments. However, in the alternative, the court also finds that the ALJ's severity determination was supported by substantial evidence.

### 1. Diabetes

With respect to the diabetes, the ALJ found that "[t]reatment notes indicate that the claimant's diabetes is managed with oral medication and dietary restrictions. (Exhibits 2F, 5F, 15F, and 16F)." (T. 17). Plaintiff argues that the ALJ's statement is

---

[7] Dr. Diallo was one of the physicians at Lourdes Hospital where plaintiff went for his primary medical care. Although some of the reports from Lourdes are signed by Dr. Diallo, most of the primary care reports are signed by Nurse Practitioner Dorene Aleccia. Dr. Boyle's reports (T. 449-52) are also from Lourdes Hospital, as are Dr. Shamsuddin Rana's sleep study reports. (T. 420-30, 484-531).

[8] The ALJ stopped at step four because he found that plaintiff's impairments did not prevent him from performing his prior work.

unsupported because of the notations in the record indicating high glucose readings, and Dr. Boyle's 2012 statement that the diabetes was "uncontrolled." (Pl.'s Br. at 12).

While it is true that there are various reports in which plaintiff's glucose has been very high, there are several reports indicating that plaintiff's diabetes is managed with oral medication and diet. The record indicates that plaintiff's glucose becomes uncontrolled when he goes off of his diet, gains weight, and his medications are not adjusted properly. Plaintiff's diabetes was mentioned in a report from United Health Services on December 30, 2009. (T. 275). The nurse who wrote the report stated that plaintiff "has been managed with diet-oral medications." (*Id.*) The "negatives" were listed as excessive thirst and weight loss, not fatigue or anxiety. The nurse stated that plaintiff was compliant with his medications, was "feeling better," and he was "watching his diet."

On November 3, 2010, plaintiff **told** Dr. Diallo that he was very lethargic all the time. (T. 297). Dr. Diallo stated that "[plaintiff] has diabetes and complains of being very lethargic all the time." (T. 297). Dr. Diallo did not conclude that plaintiff's diabetes made plaintiff lethargic all the time. Dr. Diallo noted in the same report, that the plaintiff became very angry when they discussed physicians who told plaintiff to lose weight.[9] (T. 298). On February 3, 2011, plaintiff's glucose was 215. (T. 294). Dr. Mamadou Diallo, M.D. referred plaintiff to a dietitian. (T. 294). It appears from subsequent medical reports that once plaintiff's medications and diet were adjusted, his

---

[9] This is the same appointment during which the plaintiff requested Oxycodone for his back pain, and Dr. Diallo refused to give it to him. (T. 298).

glucose dropped to more normal levels, even though it is clear that he has diabetes.

While plaintiff cites May and June 2011[10] reports which state that plaintiff's A1C[11] was "worsening," he fails to cite the May 19, 2011 narrative report by NP Aleccia which states that, although plaintiff's last A1C was 8.1 – "worse than it was before,"[12] his fasting glucose had improved, and he had lost eight pounds from the previous visit. (T. 370). NP Aleccia noted that plaintiff did not have the equipment to test his glucose, so she gave him a prescription for these materials, and instructed him on how to use them. (T. 370). The June 2, 2011 narrative report by NP Aleccia stated that "[h]e is doing much better. . . . has lost 21 pounds since February . . . [, and] his fasting sugars are much better. (T. 368). Plaintiff was "feeling better" and exercising "daily." (T. 368). Plaintiff also fails to cite the July 7, 2011 narrative report which specifically states that plaintiff's diabetes was in "much better control." (T. 366). NP Aleccia noted that plaintiff was exercising and losing weight. (*Id.*) Plaintiff's A1C test result was down to 6.7 percent. (T. 367).

---

[10] Plaintiff's counsel is citing to the laboratory reports, rather than the nurse practitioner's narrative reports from May and June 2011. (T. 395, 398). The ALJ and the court must follow the medical providers' interpretation of the laboratory reports since neither adjudicator is a medical professional.

[11] An A1C test is a common blood test used to diagnose type 1 and type 2 diabetes and to gauge how well an individual is monitoring the diabetes. http://www.mayoclinic.org/tests-procedures/a1c/basics/definition/prc-20012585. The A1C test results reflect an individual's average blood sugar level for the past two to three months, measuring the percentage of hemoglobin that is coated with sugar. The higher the A1C level, the poorer the blood sugar control, and the higher the risk of diabetic complications. (*Id.*) A "normal" level ranges from 4.5 to 6 percent. Someone who has "uncontrolled" diabetes may have a level of above 8 percent. (*Id.*) "For most people who have previously diagnosed diabetes, an A1C level of 7 percent or less is a common treatment target," but higher levels may be chosen in some individuals. (*Id.*)

[12] Plaintiff's previous A1C was 7.7 percent in March of 2011. (T. 373).

On August 24, 2011, NP Aleccia stated that plaintiff's blood sugar had actually dropped too low when he did not have any carbohydrates at dinner, and that his glucose was still low the next morning "during exercise" because he was "taking a whole Metformin now."[13] (T. 364). NP Aleccia stated that plaintiff had lost forty-six pounds since November and was "doing quite well." (*Id.*) NP Aleccia stated that she would adjust his medication, and would "decrease" the amount of Glipizide[14] that plaintiff was taking. (*Id.*)

On November 9, 2011, plaintiff saw NP Aleccia for a cold, but she noted that plaintiff had moved, had stopped taking one of his blood pressure medications, and had gained nine pounds. (T. 362). There was no mention of his diabetes, other than to order another A1C test. On November 21, 2011, NP Aleccia stated that plaintiff came in for a "lab follow up." (T. 350). She stated that plaintiff "had not been taking his medication" and "has been gaining weight." In the section titled "Plan," NP Aleccia stated that she told plaintiff that he should "try to lose some more weight. He was doing so well before." (*Id.*) On March 14, 2012, plaintiff gained another five pounds, but his appointment with NP Aleccia was for his back pain. (T. 357). During that appointment, plaintiff told NP Aleccia that his blood sugar had been "running in the 130s-140s." (*Id.*) On April 11, 2012, plaintiff's A1C was down to 6.7 percent, his

---

[13] Metformin is used alone or with other medications for the treatment of type 2 diabetes and controls the amount of glucose in the blood. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html.

[14] Glipizide is a medication used along with diet, exercise, and sometimes, with other medications to treat type 2 diabetes by controlling the amount of sugar in the blood. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a684060.html.

fasting glucose was 136, and he had lost seven pounds. (T. 355). On May 23, 2012, NP Aleccia still reported that plaintiff's recent blood work showed an A1C of 6.7 percent and fasting glucose of 138.[15] NP Aleccia never noted that plaintiff was "lethargic" as the result of his diabetes, and his blood sugar was never up to 300 during the examinations noted above through 2011 and May of 2012.

On October 25, 2012, Dr. Michele Boyle, M.D. reported that plaintiff's "sugars are 200 and 300." (T. 449). But, she also noted that the reason for this increase was that "he got off his diet, stopped exercising, and he has gained weight." (*Id.*) She cited his previous success in losing weight, and noted that he was doing much better with his diabetes, to the point where his medication had been decreased. However, on October 25, 2012, because of the increase in blood sugar, the doctor increased plaintiff's Glipizide and counseled plaintiff to get the numbers below 120. (*Id.*) Plaintiff was told that if his sugars did not meet this goal after a week, his Glipizide could be increased "some more." (*Id.*) Thus, the ALJ was correct that plaintiff's diabetes was controlled with diet and medication, and apparently, exercise. In her assessment, Dr. Boyle did not use the word "uncontrolled," she actually stated that plaintiff's diabetes was in "suboptimal" control. (T. 449). Dr. Boyle proposed to adjust his medication and attempt to get plaintiff's glucose back in line.

The ALJ did not question the diagnosis of diabetes. He only questioned the alleged effect that the impairment had on plaintiff's ability to work. Plaintiff claims that the high "sugars" made him tired and anxious, but for most of 2010, 2011 and

---

[15] She appears to have been reporting the March 2012 numbers.

2012, plaintiff's sugars were not at the level that allegedly made him tired and anxious.[16]  There is no indication that the diabetes affected the plaintiff's ability to perform basic work activities, and the ALJ's determination that the plaintiff's diabetes was not a severe impairment is supported by substantial evidence in the record.

## 2.    Sleep Apnea

Plaintiff also alleges that the ALJ erred in determining that plaintiff's sleep apnea was not a severe impairment. (Pl.'s Br. at 13-14).  In July of 2012, plaintiff was referred to Dr. Shamsuddin Rana, M.D. by Dr. Boyle and NP Aleccia for treatment of plaintiff's sleep apnea. (T. 420-22).  In his initial consultative report, Dr. Rana discussed the nature of plaintiff's sleep disorder, and discussed the benefits of weight reduction, sleep hygiene, quitting smoking, and safe driving. (T. 422).  In August of 2012,[17] plaintiff underwent a sleep study which revealed "very sleep disordered breathing." (T. 423). Dr. Rana stated that during the nasal CPAP[18] component of the study, plaintiff required a BiPAP,[19] and that this "resolved [his] sleep-disordered breathing.  The oxygen

---

[16] In Dr. Magurno's consultative report, dated January 3, 2013, she states that plaintiff's sugars are "now running in the 200s." (T. 532).  It appears that this information was told to Dr. Magurno by plaintiff because it does not appear that she tested his sugar as part of the examination, and there are no other reports after the October 25, 2012 report in which Dr. Boyle noted that plaintiff was doing well until he went off his diet and gained weight. (T. 449).

[17] The summary of Dr. Rana's study is also part of the administrative record. (T. 428-30, 431-33 (duplicate)).

[18] CPAP stands for Continuous Positive Air Pressure. A CPAP machine delivers pressurized air at a constant pressure through a mask to the individual's airway to treat sleep apnea. http://emedicine.medscape.com/ article/295807-treatment#d8.

[19] BiPAP stands for Bi-level Positive Air Pressure.  A BiPAP machine permits independent adjustment of the pressures delivered during inspiration and expiration. http://emedicine.medscape. com/article/295807-treatment#d8.  BiPAP is generally used for individuals who cannot tolerate the

saturation was normalized. Snoring was completely resolved too." (T. 423-24). Dr. Rana prescribed a BiPAP, weight reduction, and emphasized a low fat, low cholesterol diet with physical activity. (T. 424, 430).

On September 5, 2012, Dr. Rana wrote that plaintiff was doing fairly well, and he was not as foggy and sleepy as before the use of the BiPAP, although he was still taking naps in the afternoons three to four times per week. (T. 488). In a form for compliance information, it is noted that in the 86 days between September 11, 2012 and December 5, 2012, plaintiff used his BiPAP machine 71 days, with 81% usage. (T. 501). On December 10, 2012, Dr. Rana noted that plaintiff was in good compliance.[20] (*Id.*) Other than plaintiff's occasional statements about his lethargy,[21] as stated by defendant, there is no objective evidence to show that plaintiff's sleep apnea affected his ability to perform work-related activities. *See Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014) (plaintiff did not meet his burden to show that various impairments, including sleep apnea, were severe when plaintiff benefitted from treatment in ways that minimized their impairing effect); *Niles v. Astrue*, 32 F. Supp. 2d 273, 282 (N.D.N.Y. 2012) (sleep apnea found to be non-severe because plaintiff did not point to any

---

high CPAP pressure or who have other complications. *Id.*

[20] The first month, Dr. Rana indicated that plaintiff was in fair compliance. (T. 502).

[21] The court notes that the ALJ specifically stated that he found the plaintiff's statements as to the intensity, frequency, and limiting nature of his impairments to be not fully credible." (T. 21). "An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). Plaintiff in this case did not challenge the ALJ's credibility determination.

objective evidence of a significant impairment arising from his sleep difficulties, even though treating nurse practitioner stated that plaintiff's insomnia impaired his concentration, focus, and capabilities in combination with his other impairments – plaintiff was prescribed a CPAP machine and his sleep was described as "adequate"). *But see Solsbee v. Astrue*, 737 F. Supp. 2d 102, 111 (W.D.N.Y. 2010) (the doctor reported "excessive daytime sleepiness, loud snoring, and daytime fatigue, and plaintiff was unable to use the CPAP machine – ALJ erred in finding sleep apnea non-severe). Thus, there is no indication that plaintiff's sleep apnea affected his ability to perform basic work activities.[22]

## VII. **RFC/Treating Physician/Weight of the Evidence**

### A. **Legal Standards**

#### 1. **RFC**

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

---

[22] In any event, as stated above, even if the ALJ had erred in determining that plaintiff's sleep apnea was not a severe impairment, the ALJ considered this impairment in his ultimate RFC determination. *See Wavercak v. Astrue*, 420 F. App'x 91, 93 (2d Cir. 2011) (ALJ found sleep apnea not a severe impairment but also considered the totality of plaintiff's impairments in determining RFC).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## 2. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a

treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

In making his determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. This issues include – whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### B. Application

Plaintiff argues that the ALJ's RFC determination is incorrect and argues that the ALJ failed to properly weigh the medical evidence in the record, including evidence from plaintiff's treating sources. This court does not agree.

## 1.    Non-Exertional (Mental) Impairments

Plaintiff argues that the ALJ should have found that plaintiff had "moderate limitation[s]" in his abilities to perform activities within a schedule, maintain regular attendance, maintain concentration, persistence, and pace, and in his ability to be punctual within customary tolerances.  Plaintiff contends that these limitations would render him unable to perform his prior work because his job as an electronics assembler required attention, consistency, and pace. (Pl.'s Br. at 14-17).

The ALJ first considered plaintiff's "concentration, persistence, and pace" in his step three determination that plaintiff did not meet a listed impairment. (T. 18-19).  The ALJ found that plaintiff had only "mild" limitations in these areas.  The ALJ found that even though the non-examining medical source, Dr. Altmansberger, opined that plaintiff had "moderate" limitations in "this category," Dr. Long noted in her consultative report, that plaintiff obtained a GED, and appeared to be functioning on an average intellectual level with a good fund of information. (T. 18) (citing T. 301).

A January 5, 2012 mental health evaluation from the Broome County Mental Health Clinic notes that plaintiff can use a computer.[23] (T. 18) (citing T. 344).  The January 5, 2012 report also states that plaintiff's attitude was "cooperative," his energy and attention were "alert," his social skills were "average," his memory was "good,"[24] and his intellect was "average." (T. 344).  He was "personable, easy going, pleasant to

---

[23] The report was completed by Len Mantei, a social worker. (T. 345).

[24] In his "Interpretive Summary," Social Worker Mantei stated that plaintiff's memory was "fair to good for recent and remote events." (T. 345).

speak with, determined, and independent . . . ." (*Id.*)  The ALJ also cited Dr. Mahfuzar

Rahman's initial evaluation of plaintiff, dated May 22, 2012 in which the doctor stated

that plaintiff's speech was normal, his thought processes were logical and "goal-

directed," he had no delusions, obsessions, and no suicidal or homicidal ideation. (T.

19) (citing T. 341).  Plaintiff's memory functions were intact, and his insight and

judgment were good." (*Id.*)  As the ALJ properly noted, the limitations considered at

step three do not constitute an RFC determination, which involves a more detailed

assessment by itemizing various of the functions contained in the broad categories

discussed above. (T. 19).  Therefore, the ALJ continued his analysis of plaintiff's mental

limitations as he considered plaintiff's RFC at step four.

In his RFC determination at step four, the ALJ found, inter alia, that plaintiff

could understand and follow simple and complex instructions, as well as perform simple

and more complex tasks with intermittent supervision and independently. (T. 19).  The

ALJ found that plaintiff could maintain attention and concentration for simple and more

complex tasks, regularly attend to a routine, and maintain a schedule. (T. 20).

"Significant weight" was given to "the opinions of the Administration's

consultative examiners and psychiatric consultant, due to their programmatic expertise

and the consistency of their opinions with the overall medical evidence. (T. 22)

(referring to Ex. 6F (Sara Long, Ph.D.), 7F & 8F (Dr. R. Altmansberger)).  While it is

true that the ALJ did not extensively discuss the reports to which he gave "significant

weight," and devoted more of his discussion to the reports to which he gave very little

weight, the court has reviewed the documents cited by the ALJ and agrees that his

23

determination of the plaintiff's mental RFC is supported by substantial evidence.

In May of 2011, Dr. Sara Long, Ph.D. conducted a consultative examination of plaintiff. (T. 300-303). As plaintiff points out, Dr. Long stated in the "Attention and Concentration" section of her report that plaintiff subtracted three from twenty with the result of 27, notwithstanding Dr. Long rephrasing the question three ways. (T. 301). Plaintiff claims that this statement indicates that Dr. Long believed that plaintiff's attention and concentration were "significantly" diminished. (Pl.'s Br. at 15). However, Dr. Long also stated that "[t]his appears inconsistent with having achieved a GED." (T. 301). In her "Medical Source Statement," which plaintiff does not cite, Dr. Long stated that "Mr. Truman was able to follow and understand simple directions and instructions and to perform simple tasks independently. ***He was able to maintain attention and concentration and is able to maintain a regular schedule***." (*Compare* T. 301 *with* 302) (emphasis added). Thus, Dr. Long did not find that plaintiff's attention and concentration were "significantly" diminished.

Dr. Long also stated that the results of her examination were "consistent with stress-related problems," but that "in itself, this does not appear to be significant enough to interfere with his ability to function on a regular basis." (T. 302). Dr. Long concluded that "on his paperwork, [plaintiff ] had indicated some depression and anxiety, but no symptoms are reported or observed during this evaluation." (T. 302). Thus, contrary to plaintiff's argument, Dr. Long's complete report supports the ALJ's determination that plaintiff is able to maintain attention and concentration as well as maintain a schedule.

The ALJ also gave significant weight to Dr. Altmansberger, a non-examining agency medical consultant who, while checking a box indicating that plaintiff had "moderate" limitations in maintaining concentration, persistence, and pace (T. 314) for purposes of the step three Listing analysis, ultimately concluded in his Mental RFC assessment that plaintiff had no significant limitation in the ability to maintain attention and concentration for extended periods and in the ability to sustain an ordinary routine without special supervision. (T. 318). He found a "moderate" limitation in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (*Id.*) However, he also found that plaintiff was not significantly limited in his ability to carry out very simple, as well as detailed instructions and "work in coordination with or proximity to others without being distracted by them." (T. 318).

Finally, Dr. Altmansberger found that plaintiff was not significantly limited in the ability to complete a normal work day and work week and perform at a consistent pace without an unreasonable number of rest periods. (T. 319). Although Dr. Altmansberger was not an examining physician, the ALJ may rely on the opinion of a non-examining physician, when the opinion is consistent with that of the examining physicians and is supported by substantial evidence in the record. *See Bessette v. Colvin*, No. 08-CV-828, 2015 WL 867172, at *11 (D. Vt. Feb. 27, 2015). Dr. Altmansberger's report is consistent with that of Dr. Long, and the court finds that the ALJ gave appropriate weight to these opinions.

The ALJ gave "very little weight" to the opinion of Nathan Hare, Ph.D, who

examined plaintiff for the Department of Social Services on July 25, 2012, and completed a questionnaire on September 7, 2012, stating that plaintiff was either "unable to meet competitive standards"[25] or had "no useful ability to function" in most areas, including performing at a consistent pace, maintaining attention for a two hour period, and maintaining regular attendance. (T. 22) (referring to T. 550-51). The ALJ gave this report little weight because it was a "one-time"[26] evaluation that was not consistent with the longitudinal medical evidence. (T. 22). In addition, the ALJ took issue with the heading of "unable to meet competitive standards" because this was a "vocational assessment" that was beyond Dr. Hare's expertise.[27] (*Id.*)

The court notes that there is no evidence in the record to support a finding that plaintiff has "no useful ability to function" in as many areas as noted by Dr. Hale. Dr. Hale states that plaintiff has "no useful ability to function" in his ability to "[m]aintain attention for [a] two hour segment," while stating in his narrative report that plaintiff was able to sit through the entire interview of approximately 60 minutes with no

---

[25] "Unable to meet competitive standards" is defined in the form to mean that the individual "cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting." (T. 550).

[26] Plaintiff also argues that Dr. Hale's report should not have been given very little weight because it was a "one time" examination, while giving great weight to Dr. Long, who also only examined plaintiff once. (Pl.'s Br. at 21). However, the ALJ did not reject Dr. Hale's opinion solely because he saw plaintiff once, but also because his opinion was not consistent with the medical evidence in the record.

[27] The court notes that in his narrative summary and "medical source statement," Dr. Hare    a psychologist    states that "this patient is not able to do sustained work-related physical or mental activities in a work like setting on a regular and continuing basis." (T. 548). Clearly, Dr. Hare had no expertise in determining plaintiff's "physical" abilities, and his generalization is contrary to the evidence of record.

apparent pain behaviors, the tone and pace of his speech was normal, and his affect was labile. (T. 545, 550). Dr. Hale also stated in his narrative report that attention/concentration was "impaired upon testing; his short term memory was impaired; but his long term memory was grossly intact. (T. 546). Plaintiff's use of language and observed conceptual ability indicated average to low average intellectual ability." (T. 546). However, in Dr. Hale's "check box" medical source statement, he finds that he is "unable to meet competitive standards" in his ability to ask simple questions or carry out simple instructions. (T. 550). These severe restrictions are not consistent with any medical source's interaction with this plaintiff. Thus, the ALJ was justified in giving Dr. Hale's report very little weight.

The ALJ also gave very little weight to treating NP Aleccia's "Medical Source Statement" because NP Aleccia is not an "acceptable medical source" for purposes of the Act,[28] and her opinion was not consistent with the overall medical evidence. (T. 23). NP Aleccia performed examinations of plaintiff at Lourdes. NP Aleccia wrote narrative reports as a result of these examinations, but she also submitted two questionnaires at plaintiff's counsel's request. (T. 407-409, 458-61). The first questionnaire is dated July 18, 2012, and the second questionnaire is dated November 8, 2012. (*Id.*) The second questionnaire is a copy of the first questionnaire, with a cover sheet entitled "Addendum to Questionnaire." (*Id.*) Although the first questionnaire has Dr. Diallo's name typed

---

[28] The regulations indicate that a nurse practitioner is not an acceptable medical source to establish an impairment, however, an NP is listed in a group of "[o]ther sources," whose opinions may be considered in determining the extent of the plaintiff's restrictions based on the diagnosis of an acceptable medical source. 20 C.F.R. §§ 404.1513(d)(1); 416.913(d)(1).

below the signature line, it is clearly signed by NP Aleccia. The cover page of the second questionnaire has NP Aleccia's name typed under the signature, and the two signatures are identical.

The ALJ also indicated that NP Aleccia's "medical source statements" were given little weight because of her lack of specialty. NP Aleccia's questionnaire stated that the effect of plaintiff's impairment on his concentration was "mild," but the effect on his work pace was "severe." (T. 408, 460). To the extent that plaintiff alleges that his mental impairment affects his concentration or attention, it is unclear how NP Aleccia would be able to assess the limitations on plaintiff's concentration and work pace when she stated herself that she was not licensed to treat mental health issues.[29] (*See* T. 355, 460). Thus, the ALJ was justified in giving NP Aleccia's assessment of plaintiff's mental limitations very little weight.

The ALJ also considered Dr. Mahfuzar Rahman's check-box questionnaire which noted a "marked" limitation in plaintiff's ability to complete a normal workday and work week without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (T. 463). Dr. Rahman is a treating psychiatrist. However, the ALJ gave little weight to this check-box questionnaire because it was unaccompanied by any explanation, and Dr. Rahman had a very limited "treatment continuum" with plaintiff. (T. 22-23). The ALJ noted that plaintiff only saw this doctor three or four times, once was for an intake

---

[29] The ALJ also rejected her physical assessments. The court will discuss plaintiff's physical impairments below.

evaluation, and the subsequent visits were for medication management. (T. 22). Plaintiff argues that Dr. Rahman saw plaintiff at least six times.[30] (Pl.'s Br. at 26).

The record shows that Dr. Rahman saw plaintiff on 5/22/12; 6/21/12; 7/24/12; and 9/8/12. (T. 340-42, 337, 474, 476-77). Plaintiff was seen by social workers on 1/5/12 and 7/13/12. (T. 343-45, 473). Dr. Rahman's check-box form dated 11/27/12 does not appear to have been accompanied by an in-person examination. In any event, even assuming that Dr. Rahman qualifies as a treating physician, as the defendant points out, Dr. Rahman's actual narrative examination notes are largely consistent with the ALJ's mental RFC. (*See* T. 340-42, 468-70, 471-72, 474-75, 476-77). To the extent that Dr. Rahman's check-box form is inconsistent with his treatment notes, the ALJ was justified in rejecting the opinion expressed on the form.

Dr. Rahman's May 22, 2012 in-person evaluation of plaintiff states that personal grooming was average, and he made good eye contact. (T. 341). Although plaintiff described himself as being depressed, and his affect was restricted, his speech was normal in all spheres, his thought processes were logical and goal oriented, he had no delusions, obsessions, or suicidal or homicidal ideation, his intelligence was average, his memory was intact in all spheres, and his insight and judgment appeared to be fair to good. (T. 341).

However, Dr. Rahman assessed a Global Assessment of Functioning ("GAF")

---

[30] While plaintiff appears to be incorrect about the number of times that he was actually examined by Dr. Rahman, the court can assume that Dr. Rahman is a treating physician. The ALJ's comment merely indicates that, as a treating physician, Dr. Rahman did not see the plaintiff extensively.

score of 45 which indicates "serious symptoms," including suicidal ideation, severe obsessional rituals, or a serious impairment in social, occupational, or school functioning, such as "no friends" or inability to keep a job. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV")*, at 32 (4th ed. 2000)). GAF is a 100 point scale, and 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." DSM-IV-TR at 32-34. *See Kohler v. Astrue,* 546 F.3d 260, 262 n. 1 (2d Cir. 2008).

No medical source, including Dr. Rahman, has diagnosed a "serious" impairment in plaintiff's social or occupational functioning due to his mental impairment. Plaintiff left his job or was let go, allegedly due to his back impairment, not to his depression.[31] The court notes that the ALJ did not mention plaintiff's GAF, which was also found to be 45 in Dr. Hare's evaluation. It has been held that the ALJ need not explicitly mention the GAF score because he gave very little weight to both the reports that cite the low score. *Marvin v. Colvin*, No. 3:12-CV-1779, 2014 WL 1293509, at *2 (N.D.N.Y. Mar. 31, 2014).

The court finds that the ALJ's rejection of the more severe limitations listed in Dr. Rahman's questionnaire is supported by substantial evidence. Although Dr. Rahman checked a box, stating that the limitation on plaintiff's ability to complete a normal work day and work week without psychological interruptions is "marked," that

---

[31] Dr. Hare noted that plaintiff left his employment because he was "missing time" due to his back problems. (T. 545). Social worker Mantei stated on January 5, 2012 that plaintiff was let go from his job due to "physical reasons." (T. 344). Plaintiff has never been unable to keep a job due to mental disabilities as mentioned in the GAF scoring system.

assessment is inconsistent with his response to another question which indicated that plaintiff had no restrictions or mild restrictions in his ability to maintain attention and concentration "for extended periods of time," and that he only had "more than slight" restrictions in the ability to perform activities within a schedule, maintain regular attendance, and/or be punctual.[32] (T. 463). The court also notes that in Dr. Rahman's reports, including his Medical Source Statement, dated 11/27/12, he specifically indicates that plaintiff has no complaints of medication side-effects. (T. 465, 471, 474). Clearly, plaintiff never complained to Dr. Rahman that his medications made him fatigued, thus interfering with his concentration or attention.

Essentially, the ALJ was presented with conflicting evidence in the record, and he resolved the conflict. It is the province of the ALJ to resolve genuine conflicts in the record. *Veino v. Barnhart*, 312 F.3d at 588. The ALJ engaged in a more detailed discussion of the reports that he rejected, rather than explaining in detail the reasons for giving the other reports significant weight. However, the Commissioner need not "reconcile explicitly every shred of medical testimony." *Galiotti v. Astrue*, 266 F. App'x 66, 66 (2d Cir. 2008) (citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)). The courts have been more concerned with "unreasoned rejections" of evidence in

---

[32] The court notes that Dr. Hare's very restrictive mental RFC is dated September 7, 2012. (T. 544). In his report, Dr. Hare stated that plaintiff's had "severe" levels of reported depressive symptoms, and "moderate to severe" levels of reported anxiety. (T. 413). However, Dr. Rahman wrote an updated report on September 18, 2012 stating that plaintiff's depression and anxiety were both "better." The doctor noted "improved mood" and "modest progress toward mood symptoms and anxiety." (T. 477). Dr. Rahman also noted that plaintiff was taking his medications and reported "no side effects." (T. 476). The difference in the reports that were less than two weeks apart is significant, in part, because plaintiff argues that Dr. Long's report is from 2011, and she did not have the benefit of the more recent evaluations. (*See* Pl.'s Br. at 23).

plaintiff's favor. *Id.* In this case, the ALJ detailed his rejection of the reports which were in plaintiff's favor. Thus, his finding that plaintiff's mental impairment did not prevent him from maintaining the attention and concentration to perform his prior work is supported by substantial evidence.

## 2. Combination of Physical & Mental Impairments

The regulations provide that the Commissioner must consider the combined effect of all plaintiff's impairments in making the disability determination. 20 C.F.R. § 404.1523. *See Petsch v. Astrue*, No. 11-CV-925, 2012 WL 3313553, at *8 (W.D.N.Y. July 19, 2012) (it is improper to determine RFC solely upon an evaluation of the plaintiff's individual complaints) (citing *Gold v. Sec. of HHS*, 463 F.2d 38, 42 (2d Cir. 1972)); *Ball v. Astrue*, 755 F. Supp. 2d 452, 464-65 (W.D.N.Y. 2010) (same).

Plaintiff argues that two "physical" providers gave opinions to the ALJ with respect to the effect that the combination of plaintiff's physical and mental impairments would have on his ability to work. The only objective clinical evidence of any back impairment is an x-ray report, dated January 14, 2011 which showed "minimal spurring of the lumbar vertebrae anteriorly at the L1-L2 with no other abnormality appreciated." (T. 293). The impression was "mild degenerative spondylosis at upper levels." (*Id.*) Plaintiff cites NP Aleccia and Dr. Lawrence Wiesner – a consultative D.O., who examined plaintiff on June 29, 2012. (T. 327-32). As stated above, the ALJ gave NP Aleccia's report little weight because she is not an acceptable medical source, and the court notes that she stated in one of her reports that she was not licenced to treat mental disorders. (T. 355). The ALJ gave Dr. Wiesner's report very little weight because his

32

conclusions were not consistent with the longitudinal medical evidence, the plaintiff's "conservative" treatment, and the plaintiff's activities of daily living. (T. 23).

At the end of Dr. Wiesner's RFC evaluation, there was a question regarding plaintiff's "concentration" and "ability to sustain work pace." (T. 332). The question was whether the plaintiff's concentration or pace – or both – would be affected by his "medical condition and/or side effects of medication." (*Id.*) Dr. Wiesner checked the box indicating a "[m]arked" limitation. It is unclear whether Dr. Wiesner was attempting to assess the plaintiff's concentration or pace as it related to his physical or both his physical and mental impairments, but there is no indication in the rest of the medical record that plaintiff's back impairment caused "marked" limitations in both concentration and work pace.[33]

Dr. Wiesner's report also contains a questionnaire. (T. 330-32). The questionnaire indicates that plaintiff cannot sit, stand, or walk for more than ten or fifteen minutes at a time. (T. 330). He also indicates that plaintiff's medications, including the medications he takes for his depression and anxiety, "cause significant fatigue." (T. 328). Both the assessment regarding plaintiff's inability to sit for more than ten or fifteen minutes and the medication side effects are not supported by the evidence in the record. Dr. Magurno stated that plaintiff was only mildly limited in his ability to sit. Even Dr. Hale noted that plaintiff was "able to sit through the entire interview of approximately 60 minutes with no apparent pain behaviors." (T. 545).

---

[33] It is unclear whether Dr. Wiesner, a DO, would be qualified to assess plaintiff's mental limitations.

The court also notes that NP Aleccia stated in the questionnaire that she completed for plaintiff's counsel that the effect on plaintiff's "medical condition" on plaintiff's concentration was "mild," while the effect on his ability to sustain work pace was "severe." (T. 408). The questionnaire also asked about medication side effects, specifically whether "any medications cause fatigue or require the patient to rest after taking same)." (T. 409). NP Aleccia responded that plaintiff "[h]as been on [medications] for a long period - side effects now **should be** minimal." (*Id.*) (emphasis added). Thus, plaintiff apparently never complained to his treating nurse practitioner that he had limiting effects from his medications. As stated above, Dr. Rahman specifically stated that plaintiff had no reported side effects from his medications. (T. 471, 474).

The ALJ did consider plaintiff's impairments in combination, but found that the combination did not prevent plaintiff from performing his prior work. Plaintiff argues that the providers are "unanimous" in finding that the combination of plaintiff's impairments would diminish plaintiff's ability to work "consistently without absences," and that the only provider who did not comment on the issue of combination of impairments was consultative examiner, Dr. Magurno. (Pl.'s Br. at 16-17). Plaintiff claims that the ALJ "would not permit" Dr. Magurno to do so. Plaintiff is incorrect in his statement.

The ALJ sent plaintiff to internist, Dr. Magurno, after the hearing, although the ALJ considered Dr. Magurno's report in his decision. (T. 21). Dr. Magurno completed her examination on January 3, 2013. (T. 532-36, 538-43). Dr. Magurno submitted a

narrative report as well as an RFC evaluation.  Dr. Magurno found that plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently. (T. 538).  She also found that plaintiff could stand and walk for a combined total of three hours and sit for six hours in an eight-hour workday. (T. 539).  On the form-RFC, Dr. Magurno also found that plaintiff could sit for one hour, stand for thirty minutes, and walk for fifteen minutes "without interruption." (*Id.*)  However, in her narrative report, she states that plaintiff has "mild limitations for bending, sitting, standing, and walking. (T. 535).  Plaintiff has "marked" limitations for squatting and no limitations for communication skills, fine motor activities, and reaching. (T. 535).  Dr. Magurno examined plaintiff with respect to his physical impairments – "low back pain" and "uncontrolled" high blood pressure.[34] (T. 538).  However, she also mentioned plaintiff's diabetes, obesity, right knee pain, history of depression and anxiety, and sleep apnea in her narrative report. (T. 535, 540).

After plaintiff's consultative examination, counsel requested that the ALJ convene another hearing, at which Dr. Magurno would appear to testify, and at which she could be cross-examined by plaintiff's counsel (T. 13).  Plaintiff's counsel wrote to ALJ Ramos, stating that he wished to examine Dr. Magurno "with respect to questions we have relative to the report on issues of obesity and its effect together with issues of fatigue and good and bad days." (T. 252).  Although the ALJ refused to convene another hearing, he specifically allowed counsel to submit questions to Dr. Magurno in writing,

---

[34] The RFC form that Dr. Magurno completed is entitled "Medical Source Statement of Ability to Do Work-Related Activities (Physical). (T. 538).

but counsel insisted on having an in-person hearing. (T. 13, 248, 252). Plaintiff's counsel never sent any interrogatories to Dr. Magurno.

In his decision, the ALJ stated that he determined that a supplemental hearing was not necessary because there was nothing in the case, or in Dr. Magurno's consultative report, that was of such an unusual nature or complexity that written interrogatories would be insufficient. (T. 13). Because plaintiff's counsel failed to submit any interrogatories within the prescribed period, the ALJ found that plaintiff "constructively waived" his right to question the consultative examiner. (*Id.*) Thus, plaintiff can not now complain that the ALJ "refused" to allow Dr. Magurno to comment on the issues in this case.[35]

Plaintiff also argues that the ALJ improperly assessed Dr. Magurno's evaluation. (Pl.'s Br. at 19-20). Counsel argues that, notwithstanding the weight that he gave Dr. Magurno's opinion, the ALJ failed to mention that Dr. Magurno also stated that plaintiff "needed a sit/stand option" because she stated that plaintiff could only sit for one hour, stand for thirty minutes and walk for fifteen minutes at a time "without interruption." (T. 539). As stated above, this assessment appears on the same page in which Dr. Magurno states that plaintiff can sit for six hours, stand for two hours, and walk for one hour in an

---

[35] The court notes that in his letter to ALJ Ramos, plaintiff's counsel asked that he be able to question Dr. Magurno on the issue of obesity and its effect, together with issues of fatigue and good and bad days. (T. 252). However, in his brief, counsel states that the ALJ refused to allow Dr. Magurno to comment on work pace or concentration. (Pl.'s Br. at 16). The issues here become a bit confused. Dr. Magurno is a family practice physician, and Dr. Weisner is a doctor of osteopathy. Initially, plaintiff's issues with concentration and pace involved his mental status, and neither Dr. Weisner, nor Dr. Magurno are qualified with respect to mental impairments. Thus, plaintiff must argue that his physical impairments cause his limitations in concentration and pace. It does not appear that Dr. Magurno would have been qualified to comment otherwise.

eight-hour day. (T. 539).

It is true that the ALJ did not mention the part of Dr. Magurno's RFC form, which stated that plaintiff could sit for one hour, stand for thirty minutes, and walk for fifteen minutes "without interruption." Defense counsel argues that this statement does not indicate that plaintiff needs a "sit/stand" option, and plaintiff could have submitted an interrogatory to clarify this statement, but did not do so. In any event, in her narrative report, Dr. Magurno stated that plaintiff would only have a "mild" limitation for bending, sitting, standing, and walking. (T. 535).

The ALJ was within his discretion to accept certain portions of the doctor's report, but reject those that are not supported by the treatment notes or other substantial record evidence. *Gray v. Colvin*, No. 1:13-CV-955, 2015 WL 5005755, at *5 (W.D.N.Y. Aug. 20, 2015) (citing *Pavia v. Colvin*, No. 6:14-CV-6379, 2015 WL 4644537, at *4 (W.D.N.Y. Aug. 4, 2015) (citing *Veino v. Barnhart*, 312 F.3d at 588). Sitting for only one hour "without interruption" is not a "mild" limitation on the ability to sit, even if one can sit for six hours. Thus, Dr. Magurno's statement that plaintiff could only sit for one hour without interruption is not consistent with any other part of her examination, and the ALJ did not err in failing to include a sit/stand option in his RFC.

## VIII. Past Relevant Work

### A. Legal Standards

The law is clear that the ALJ must evaluate plaintiff's previous specific job as well as the job as it is generally performed in the national economy pursuant to the

Dictionary of Occupational Titles ("DOT"). *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003).  At the fourth step of the disability analysis, plaintiff has the burden to show that he is unable to return to his previous specific job and an inability to perform the past relevant work "generally." *Id.* (citing *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981); Social Security Ruling ("SSR") 82-62, 1982 WL 31386 at *3 (1982).

### B.    Application

Plaintiff argues that the ALJ erred in finding that plaintiff could perform his past work as an electronics assembler.  In this case, the DOT describes the job of electronics assembler as "light," with a specific vocational preparation code ("SVP") of 4. (T. 23).  However, the ALJ found that plaintiff stated that his particular electronics assembler job involved soldering parts onto a circuit board. (*Id.*)  Plaintiff stated that the heaviest weight that he lifted and carried was ten pounds.  He also stated that he sat down most of the time and did not have to interact with others. (*Id.*)  He only had intermittent contact with his supervisors and no contact with the public at all. (*Id.*)  The ALJ found that, as plaintiff described his work, it was sedentary in nature, and neither his physical nor his mental limitations would prevent him from performing his previous job as he performed it. (T. 23-24).

Plaintiff now argues that even though he can perform sedentary work, according to Dr. Magurno, he needs a "sit/stand" option, and the ALJ never addressed the issue.  He concedes that the most weight he had to lift was ten pounds, but that he had to lift this amount of weight "constantly," rather than only "frequently" as it is listed in the description of sedentary work.  Plaintiff testified that his previous work required him to

sit most of the day and solder parts onto a circuit board. (T. 38-39, 49). While plaintiff

argues now that he had to lift "less than ten pounds" "constantly," not "frequently,"

there is absolutely no evidence or testimony that he had ten pounds in his hands

constantly. In fact, plaintiff's "Work History Report," he specifically stated that the

"heaviest" weight lifted by plaintiff in his prior work was 10 pounds, and the weight he

"frequently" lifted was "less than 10 pounds." (T. 185). Plaintiff never stated that he

lifted less than 10 pounds "constantly." Instead, plaintiff stated that he wrote, typed, or

handled small objects for "8" hours. (T. 185). In his form, he also stated that he only

walked for 15 minutes, stood for one hour, and sat for six hours.[36] He never climbed,

stooped, kneeled, crouched, crawled, or grabbed or grasped big objects. (*Id.*) Thus,

based on the description that plaintiff gave of his former work, the ALJ's finding that

plaintiff could perform his prior job was supported by substantial evidence in the record

before the ALJ.

## IX. Appeals Council Evidence

### A. Legal Standards

The regulations provide that the Appeals Council considers new and material

---

[36] While sitting for six hours is a general requirement, "the Second Circuit has observed, "[t]he regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight.'" *Nezelek v. Astrue*, No. 3:05-CV-1481, 2009 WL 1310518, at *8 n. 8 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (the ALJ's finding that plaintiff can perform sedentary work if "she is given several breaks or allowed to change positions often" does not contradict the Social Security regulations defining 'sedentary work')). *Smith v. Colvin*, No. 3:12-CV-1665 FJS/ATB, 2014 WL 98676, at *12 n.9 (N.D.N.Y. Jan. 9, 2014). While the ALJ in this case did not include the ability to change positions often in his RFC, he was justified in determining based upon Dr. Magurno's statements that her assessment did not mean that plaintiff "required" a sit/stand option.

evidence if it relates to the period on or before the date of the ALJ's decision. 20 C.F.R. § 404.976(b)(1). *See Jenkins v. Colvin*, No. 1:13-CV-1035, 2015 WL 729691, at *5 (N.D.N.Y. Feb. 19, 2015) (citation omitted). If the Appeals Council finds that the evidence is new and material, it will review the case if it finds that the ALJ's decision is contrary to the weight of the current record evidence. *Id.* (citing 20 C.F.R. § 404.970 (b). Even if the Appeals Council finds that the evidence is not new and material and declines to review the ALJ's decision, the evidence in question becomes part of the record for review by the court. *Id.* (citing *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996). If the Appeals Council denies review after reviewing the new evidence, the Commissioner's decision includes the AC's conclusion that the ALJ's findings remain correct despite the new evidence. *Id.*

**B.    Application**

Plaintiff's counsel submitted the testimony of VE Victor Alberigi to the Appeals Council for its review. (T. 555-63). The Appeals Council denied plaintiff's request for review, finding that there was no basis to review the ALJ's decision, notwithstanding the additional evidence submitted by plaintiff. (T. 1-2). Plaintiff argues that the Appeals Counsel erred in failing to review the ALJ's decision, and that the VE's testimony shows that an individual with plaintiff's RFC could not perform his past relevant work, nor could he perform any substantial gainful activity.

The problem with plaintiff's argument is that the questions that plaintiff's counsel asked the VE to assume that plaintiff had to "lift and maneuver objects throughout the day," without specifying what objects, how heavy they would be and what maneuvering

entailed. (T. 560). The VE was also asked to assume that plaintiff had moderate limitations in attention, concentration, and persistence. (T. 561). The VE testified that if plaintiff had a moderate reduction in his "ability to concentrate or be consistent or work at a pace," then he could not perform any substantial gainful activity. (T. 562-63). There is no indication in the record of what plaintiff's prior work actually required in terms of pace or consistency. In any event, the ALJ did not find that plaintiff was moderately limited in attention and concentration, and the court has determined that the ALJ's finding is supported by substantial evidence. Thus, the questions asked by plaintiff's counsel were meant to elicit a particular response from the VE and assumed limitations that were not included in the ALJ's properly supported RFC finding. Thus, the Appeal's Council's decision to reject plaintiff's proffered evidence was supported by substantial evidence in the record.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is affirmed, and the plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

Dated: September 17, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge